**UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

**SUMMIT 360, INC.,**
*Plaintiff-Appellant,*

**v.**

**CISCO SYSTEMS, INC.,**
*Defendant-Appellee.*

Appeal from the United States District Court for
the District of Minnesota
Case No. 0:25-cv-02202-PJS-EMB

**BRIEF OF *AMICUS CURIAE* UNITED STATES PUBLIC
INTEREST RESEARCH GROUP INC. IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL**

AMANDA G. LEWIS
CHRISTIAN HUDSON
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Tel: (202) 789-3960
alewis@cuneolaw.com
christian@cuneolaw.com

ZACHARY FREED
VIENNA E. CHAN
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
2445 M Street NW, Suite 740
Washington, D.C. 20037
Tel: (202) 789-3960
zfreed@cuneolaw.com
vchan@cuneolaw.com

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Consistent with Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* United States Public Interest Research Group Inc. certifies that it is a non-profit corporation, that it does not have a parent corporation, and that no publicly held corporation has ten percent or greater ownership of *amicus curiae*'s stock.

Dated: July 23, 2026

*/s/ Amanda G. Lewis*
Amanda G. Lewis

Appellate Case: 26-1787   Page: 2   Date Filed: 07/29/2026 Entry ID: 5666337

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................3

ARGUMENT .................................................................................................4

    I.    An Unduly Narrow and Inflexible Approach to Antitrust Standing Is Inconsistent with the Law...................................................................4

        A.    Antitrust standing is a fact-specific inquiry that does not exclude parties categorically. ....................................................4

        B.    Antitrust standing is not limited to consumers or competitors....................................................................................6

    II.    An Unduly Narrow and Inflexible Approach to Antitrust Standing Would Be Harmful to Consumers. ......................................................8

        A.    Market participants, including midstream participants, are uniquely positioned to detect and bring antitrust claims. ...........9

        B.    Antitrust challenges from midstream market participants serve as a critical deterrent and source of private enforcement...............................................................................10

        C.    The costs of underenforcement are borne by consumers..........12

        D.    Cisco's conduct is emblematic of right-to-repair restrictions that have harmed competition and consumers for decades. .....15

CONCLUSION .............................................................................................17

CERTIFICATE OF COMPLIANCE...................................................................19

CERTIFICATE OF SERVICE ..........................................................................20

Appellate Case: 26-1787    Page: 3    Date Filed: 07/29/2026 Entry ID: 5666337

# TABLE OF AUTHORITIES

**Cases**

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)..................................................................4, 6, 11, 13

*AT&T Mobility LLC v. The Phone Card Warehouse, Inc.*,
No. 08-cv-1909, 2009 WL 10671271 (M.D. Fla. Dec. 14, 2009) ......................7

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982).............................................................................11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
491 F.3d 380 (8th Cir. 2007)...................................................................6

*Deslandes v. McDonalds*,
No. 17-cv-4857, 2018 WL 3105955, (N.D. Ill. June 25, 2018) ........................7

*Doe v. Ariz. Hosp. & Healthcare Ass'n*,
No. 07-cv-1292, 2009 WL 1423378 (D. Ariz. Mar. 19, 2009)..........................7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)............................................................................15

*Eichorn v. AT&T Corp.*,
248 F.3d 131 (3d Cir. 2001)....................................................................7

*Fishman v. Est. of Wirtz*,
807 F.2d 520, 536 (7th Cir. 1986)............................................................5

*Graphic Products Distributors v. Itek Corp.*
717 F.2d 1560 (11th Cir. 1983)................................................................6

*Innovative Health, LLC v. Biosense Webster, Inc.*,
No. 22-cv-55413, 2024 WL 62948, at *1-3 (9th Cir. Jan. 5, 2024) .................16

*Innovative Health, LLC v. Biosense Webster, Inc.*,
No. 25-cv-6042 (9th Cir. May 29, 2026)..................................................13

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)..................................................................10

Appellate Case: 26-1787    Page: 4    Date Filed: 07/29/2026 Entry ID: 5666337

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948)...................................................................................5, 8

*Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*,
  No. 96-cv-3839, 1997 WL 166497 (S.D.N.Y. Apr. 9, 1997)................................6

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
  381 U.S. 311 (1965)......................................................................................13

*Roman v. Cessna Aircraft Co.*,
  55 F.3d 542 (10th Cir. 1995)..........................................................................7

*State of S.D. v. Kansas City S. Indus., Inc.*,
  880 F.2d 40 (8th Cir. 1989)............................................................................5

*Summit 360, Inc. v. Cisco Systems, Inc.*,
  No. 25-cv-02202, (D. Minn. Mar. 30, 2026) ....................................................4

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................... 5, 10

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969)......................................................................................13

**Statutes**

15 U.S.C. § 15 ..............................................................................................11

**Other Authorities**

Cisco, *Small Business Networking Resources* ........................................................15

Erin Fischer, *Antitrust's Efficient Enforcer Rule and Why It Should Be Abandoned*
  (Remedies and Litigation Strategy, Working Paper No. 4086704, 2022)...........4

Fed. Trade Comm'n, *Nixing the Fix: An FTC Report to Congress on Repair
  Restrictions* (2021)................................................................................. 15, 16

Herbert Hovenkamp, *Worker Welfare and Antitrust*,
  90 U. CHI. L. REV. 511 (2023) .........................................................................7

Joseph Farrell & Carl Shapiro, *Dynamic Competition with Switching Costs*,
  19 RAND J. ECON. 123 (1988)........................................................................12

iii

McKinsey & Co., *The Data Center Balance: How U.S. States Can Navigate the Opportunities and Challenges* (Aug. 8, 2025) ....................................................14

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 297 (rev. ed.1995) ............................................8

Press Release, Fed. Trade Comm'n, *FTC, States Secure Settlement with Deere & Company, Advancing Farmers' Right to Repair* (July 8, 2026) ........................16

Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (2008) ...............................11

Ross Law, *Innovative Health Awarded $147m in Antitrust Lawsuit Against J&J's Biosense Webster*, MEDICAL DEVICE NETWORK (May 19, 2025) .......................17

Sherry R. Feinsmith, *Treble Damage Actions for Violations of Section 7 of the Clayton Act*, 38 CHICAGO L. REV. 404 (1971) ...................................................10

Testimony of Nathan Proctor, U.S. PIRG Senior Right to Repair Campaign Director, *Right to Repair: Legislative and Budgetary Solutions to Unfair Restrictions on Repair*, 117th Cong. (2022) ......................................................12

U.S. Chamber of Commerce, *Cloud-Based POS Systems Explained: Key Benefits and Examples* (Apr. 17, 2025) ........................................................................14

Whitson Gordon, *Cisco Is Making It More Difficult to Use Pre-Owned Hardware*, IFIXIT (Aug. 9, 2019).............................................................................................12

**Rules**

Fed. R. App. P. 32(a)(5-6) ..........................................................................................19

Fed. R. App. P. 32(a)(7)(B) ........................................................................................19

Fed. R. App. P. 32(f)....................................................................................................19

Appellate Case: 26-1787     Page: 6     Date Filed: 07/29/2026 Entry ID: 5666337

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* United States Public Interest Research Group Inc. ("U.S. PIRG") is a national, nonprofit organization that advocates for the public interest by addressing the systemic problems affecting millions of Americans. U.S. PIRG stands as a voice for the public against entrenched interests, employing grassroots organizing and direct advocacy for the public across critical sectors including technology, transportation, energy, consumer protection, and healthcare.

Dedicated to promoting competitive markets, U.S. PIRG works to dismantle the barriers that inflate expenditures for consumers and small businesses. Through rigorous research, policy advocacy, and public education, the organization identifies and challenges practices that burden consumers and small businesses, including anticompetitive conduct in midstream resale markets. U.S. PIRG frequently participates as *amicus curiae* in litigation that implicates the public interest to provide a consumer-centric perspective including in several lawsuits alleging anticompetitive restrictions on consumers' right to repair.

As a leading advocate for consumers, U.S. PIRG has a longstanding history of advocating for law and policies in defense of the right to repair, reuse, and

---

[1] *Amicus* certifies that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to its filing.

1

recycle electronics products and services. U.S. PIRG has a profound interest in preserving the efficient and robust enforcement of antitrust laws. Consistent with this, ensuring that consumers' and small businesses' right to repair is not hindered by onerous and anticompetitive restrictions is one of U.S. PIRG's core consumer protection priorities.[2] A critical piece of this campaign is for consumers and small businesses to be able to have their day in court to challenge these and other types of anticompetitive practices. U.S. PIRG submits this brief because an unduly narrow and rigid interpretation of antitrust standing poses a threat to deterrence and accountability for firms that impose unlawful restrictions on other market participants in the right to repair context and beyond, including the conduct at issue in this case.

---

[2] *See* PIRG, *Consumer Protection*, https://pirg.org/our-work/consumer-protection/ (last visited July 22, 2026).

Appellate Case: 26-1787    Page: 8    Date Filed: 07/29/2026 Entry ID: 5666337

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Midstream market participants like distributors, independent resellers, and discounters are an important source of competition that provides consumers with increased choice and access to high-value products at more affordable prices. Consistent with the vital role that midstream market participants play in delivering the benefits of competition to consumers, antitrust law provides a flexible and fact-specific framework for assessing whether such market participants can establish antitrust standing. In this case, particularly at the motion to dismiss stage, denying Summit 360, Inc. ("Summit" or "Appellant") standing to pursue its claims means that Cisco Systems, Inc. ("Cisco" or "Appellee") can continue to use its market power to eliminate the threat that independent distributors pose to its pricing power over end-users—including the countless small- and medium-sized business owners for whom Cisco's networking equipment serves as the backbone of their operations. Upholding an unduly narrow and inflexible approach to antitrust standing, which excludes Summit, would be 1) inconsistent with the law; and 2) harmful to consumers, in that such a holding would undermine private enforcement and make it more likely that substantial harm to consumers and competition would go unchecked.

Appellate Case: 26-1787     Page: 9     Date Filed: 07/29/2026 Entry ID: 5666337

**ARGUMENT**

**I.     An Unduly Narrow and Inflexible Approach to Antitrust Standing Is Inconsistent with the Law.**

    **A.     Antitrust standing is a fact-specific inquiry that does not exclude parties categorically.**

It would be inconsistent with the law to adopt an unduly narrow and inflexible approach that limits antitrust standing to "competitors or consumers," as embraced by the district court in its order granting Cisco's motion to dismiss. *Summit 360, Inc. v. Cisco Systems, Inc.*, No. 25-cv-02202, slip op. at 9-12 (D. Minn. Mar. 30, 2026).

First, the caselaw is clear that antitrust standing depends on antitrust injury and other fact-specific determinations, not formal labels. The Supreme Court set forth the applicable test for antitrust standing in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) [hereinafter *AGC*]. This Circuit, like the First, Third, Fourth, Seventh, and Ninth circuit courts of appeals, applies a multi-factor test that merges the "efficient enforcer" factors and the "antitrust injury" doctrine conceived of in *AGC*. *See* Erin Fischer, *Antitrust's Efficient Enforcer Rule and Why It Should Be Abandoned* 18-19 (Remedies and Litigation Strategy, Working Paper No. 4086704, 2022), https://ssrn.com/abstract=4086704 (surveying the law on antitrust standing across multiple federal circuit court jurisdictions).

4

Courts in this Circuit use a six-factor test: "(1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness of the connection between the injury and the alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages." *State of S.D. v. Kansas City S. Indus., Inc.*, 880 F.2d 40, 45-46 (8th Cir. 1989).

None of these factors categorically limit antitrust standing to consumers or competitors, nor do they preclude midstream market participants from establishing standing. Indeed, antitrust law "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). Instead, the "antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect." *Fishman v. Est. of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986). Courts have consistently held that antitrust law is meant to address actions that "harm the competitive *process*[,]" whether the victims be sellers, intermediaries, workers, or customers. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (antitrust law is meant to protect against actions that "harm the competitive *process*"); *see also Craftsmen*

5

*Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007) (upholding grant of summary judgment because the plaintiff failed to adequately allege harm to the competitive process).

**B.      Antitrust standing is not limited to consumers or competitors.**

Further demonstrating that the law does not limit antitrust standing to competitors and consumers, antitrust law is replete with cases that confer antitrust standing on a wide range of market participants including midstream firms, entities characterized as sellers or suppliers, and even entities that are not current market participants.

In fact, midstream market participants, like Summit, have been found to be appropriate plaintiffs in antitrust cases both before and after *AGC*. In *Graphic Products Distributors v. Itek Corp.*, a former distributor of platemakers (a machine for making printing plates) brought a successful antitrust suit against a dominant manufacturer of platemakers for foreclosing intrabrand competition by way of a "system of territorial restraints… [resulting in] adverse effects on price competition and consumer welfare." 717 F.2d 1560, 1573-78 (11th Cir. 1983). In another example, the court recognized that a discounter and distributor of medical products established antitrust standing in its suit against 3M for conspiring to prevent it from selling 3M products. *Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, No. 96-cv-3839, 1997 WL 166497, at \*5-6 (S.D.N.Y. Apr. 9, 1997). More recently, in *AT&T*

6

Appellate Case: 26-1787      Page: 12      Date Filed: 07/29/2026 Entry ID: 5666337

*Mobility LLC v. The Phone Card Warehouse, Inc.*, the court found that a former reseller of phone cards successfully pled its case against AT&T for exclusionary conduct and harm to interbrand competition. No. 08-cv-1909, 2009 WL 10671271, at *7 (M.D. Fla. Dec. 14, 2009).

Suppliers, including sellers of labor (workers), are also frequently plaintiffs in successful cases alleging "anticompetitive behaviors [that] include horizontal wage-fixing and anti-poaching agreements, as well as vertical noncompete agreements that limit employee mobility." Herbert Hovenkamp, *Worker Welfare and Antitrust,*

90 U. CHI. L. REV. 511, 522-23 (2023). In this context, workers are neither consumers nor competitors of the defendant, but instead are suppliers (or sellers) of their labor. In *Deslandes v. McDonalds*, a class of McDonalds workers sued McDonalds and its franchisees for conspiring not to poach other franchisees' employees. No. 17-cv-4857, 2018 WL 3105955, at *7-8 (N.D. Ill. June 25, 2018), *vacated and remanded on other grounds*, 81 F.4th 699 (7th Cir. 2023). In *Deslandes*, in its discussion of whether plaintiffs had established antitrust injury, the court made clear that antitrust standing is regularly conferred upon workers. *Id.* (citing *Eichorn v. AT&T Corp.*, 248 F.3d 131, 142 (3d Cir. 2001); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 545 (10th Cir. 1995); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 WL 1423378, at *3 (D. Ariz. Mar. 19, 2009)).

7

Similarly, courts have frequently held that other types of market participants, who are neither competitors nor consumers, can meet the requirements for antitrust standing. In *Mandeville Island Farms*, for example, sugar beet growers sued American Crystal Sugar, a refiner, for entering into a price fixing agreement with other refiners to pay a uniform price for sugar beets grown in California. 334 U.S. at 235. In that case, the Supreme Court found "that the agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers." *Id.*; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 297 (rev. ed.1995) ("Most courts understand that a buying cartel's low buying prices are illegal and bring antitrust injury and standing to the victimized suppliers.").

## II. An Unduly Narrow and Inflexible Approach to Antitrust Standing Would Be Harmful to Consumers.

Upholding the district court's unduly narrow and inflexible approach to antitrust standing would be harmful to consumers, in that such a holding would undermine private enforcement and make it more likely that substantial harm to consumers and competition would go unchecked. In part, because midstream market participants such as distributors, resellers, discounters, and independent

8

repairs shops are uniquely situated to detect and bring antitrust lawsuits, a categorical rule barring these entities from bringing antitrust cases would undermine deterrence and accountability for firms that impose unlawful restrictions on other market participants. In the right to repair context and beyond, it is ultimately consumers who would suffer most from otherwise meritorious antitrust claims never seeing the light of day or getting summarily dismissed.

### A. Market participants, including midstream participants, are uniquely positioned to detect and bring antitrust claims.

Market participants, including midstream firms, serve a vital role in efficient and effective private antitrust enforcement. Because of their unique vantage point, these firms are often the first to detect anticompetitive conduct. In contrast, individual consumers may go much longer before they notice anything is awry and may, in fact, not ever be able to connect the higher prices or lower quality they are experiencing back to a monopolist's anticompetitive conduct. Midstream market participants, such as Summit, are the canary in the coal mine. Because they are incentivized to monitor the market closely for potential opportunities and competitive threats, they are uniquely situated to identify anticompetitive harm closer to its outset. Indeed, harm to a midstream firm is in no way inconsistent with harm to consumers or competitors; in fact, it may be the most immediately palpable symptom of harm to competition in the marketplace. *See generally*

9

Appellate Case: 26-1787     Page: 15     Date Filed: 07/29/2026 Entry ID: 5666337

*Microsoft Corp.*, 253 F.3d 34 (relying extensively on evidence of Microsoft's actions aimed at eliminating the competitive threat Sun Microsystems, a software manufacturer of "middleware" product, Java, posed to its operating system monopoly to find that Microsoft engaged in unlawful conduct that resulted in harm to the "competitive process and thereby harm [to] consumers."); Statement of Dr. James A. Gosling, *United States v. Microsoft Corp.*, 253 F.3d 34 (2001) (No. 98-1232), https://www.justice.gov/atr/statement-dr-james-gosling-us-v-microsoft-corp-and-state-new-york-ex-rel-v-microsoft-corp (Sun Microsystems, software manufacturer of "middleware" product, Java, testified as to substantial harm Microsoft inflicted on midstream players); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("3M's exclusionary conduct not only impeded LePage's ability to compete, but also it harmed competition itself").

## B.     Antitrust challenges from midstream market participants serve as a critical deterrent and source of private enforcement.

Denying standing to midstream participants would severely weaken the deterrent effect intended by Section 4 of the Clayton act by eliminating a key class of plaintiffs that would otherwise be able to challenge anticompetitive conduct. *See* Sherry R. Feinsmith, *Treble Damage Actions for Violations of Section 7 of the Clayton Act*, 38 CHICAGO L. REV. 404, 409 (1971) ("Since the standing rules determine which categories of plaintiffs may challenge an alleged violator's

Appellate Case: 26-1787     Page: 16     Date Filed: 07/29/2026 Entry ID: 5666337

conduct, they play an important role, through the deterrent effect of treble damage actions, in defining the effective scope of those antitrust laws that may be enforced under section 4.").

On its face, Section 4 of the Clayton Act establishes a broad private right of action for citizen-enforcers: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . ." Clayton Act § 4, 15 U.S.C. § 15. As the Supreme Court spelled out in *AGC*, "the all-encompassing language of § 4 'reflects Congress' expansive remedial purpose in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions and would provide ample compensation to the victims of antitrust violations.'" *AGC*, 459 U.S. at 546 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982)); *see also* Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (2008) (finding that private treble-damages actions provide a greater deterrence effect than criminal enforcement by the U.S. Department of Justice).

Firms like Cisco have an undeniable motive and every reason to capitalize on a market unfettered by credible threats of private enforcement—and absent challenges like the one brought by Summit, the company can surely be expected to ratchet up their anticompetitive tactics. *See* Whitson Gordon, *Cisco Is Making It*

11

Appellate Case: 26-1787     Page: 17     Date Filed: 07/29/2026 Entry ID: 5666337

*More Difficult to Use Pre-Owned Hardware*, ɪFɪxɪᴛ (Aug. 9, 2019),

https://www.ifixit.com/News/32398/cisco-is-making-it-more-difficult-to-use-pre-

owned-hardware ("Cisco claims [its mandatory smart licensing system] allows for

easier, more flexible management of hardware licenses—but it also gives Cisco

more control over hardware you've purchased.").

### C.     The costs of underenforcement are borne by consumers.

An overly narrow approach to antitrust standing would make it more likely

that substantial harm to consumers and competition would go undetected and

unaddressed. Left unchecked, firms are motivated to disincentivize switching,

impede rivals, and entrench their dominance, leading to higher prices and fewer

options for consumers. Joseph Farrell & Carl Shapiro, *Dynamic Competition with

Switching Costs*, 19 RAND J. Eᴄᴏɴ. 123 (1988); *see also* Testimony of Nathan

Proctor, U.S. PIRG Senior Right to Repair Campaign Director, *Right to Repair:

Legislative and Budgetary Solutions to Unfair Restrictions on Repair*, 117th Cong.

(2022) ("Manufacturers have a clear incentive to control the repair of their

products, and they do so—further, in controlling repair, they harm the public.").

This effect is compounded when consumers are effectively captive, as is the case

for users of Cisco equipment. *Amicus* U.S. PIRG recently described how this

situation plays out in the healthcare sector, stating, "Across medical device

markets, manufacturers employ increasingly hidden technical and contractual

12

barriers, using the leverage of a hospital's sunk investment to eliminate competition in the aftermarket and render the hospital a captive consumer. This dynamic spans industries and renders victim diverse groups of consumers . . . ." Brief for U.S. PIRG as Amici Curiae Supporting Plaintiff, *Innovative Health, LLC v. Biosense Webster, Inc.* at 24, No. 25-cv-6042 (9th Cir. May 29, 2026).

Private antitrust enforcement, including by small, independent businesses, provides an important and valuable complement to government agencies in the efficient detection of antitrust violations and enforcement of antitrust law. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130-31 (1969) ("[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws."); *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965) ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws.").

At the end of the day, an interpretation of *AGC* that denies antitrust standing to independent resellers, such as Summit, is likely to result in higher prices and fewer choices for consumers. While this situation is very concerning to *amicus* U.S. PIRG, those concerns are greatly increased considering that upholding the district court's approach to antitrust standing in this case will have much broader

13

implications. For instance, as commerce and daily life increasingly depend on cloud-based services, consumers pay for access to essential tools and services indirectly through the price of the digital services, subscriptions, and cloud-enabled tools that they use. *See* McKinsey & Co., *The Data Center Balance: How U.S. States Can Navigate the Opportunities and Challenges* (Aug. 8, 2025), https://www.mckinsey.com/industries/public-sector/our-insights/the-data-center-balance-how-us-states-can-navigate-the-opportunities-and-challenges (describing data centers as "foundational infrastructure" for the digital services on which individuals, businesses, and governments rely). Midstream sellers and independent resellers discipline that infrastructure market by reducing the cost of acquiring, maintaining, and hosting the networking equipment that connects users to the cloud, and anticompetitive restrictions on those sellers can therefore raise costs for consumers even more.

The same cost channel affects small businesses that rely on internet connectivity as an essential method of commerce: coffee shops, grocery stores, restaurants, and other brick-and-mortar businesses increasingly use cloud-based point-of-sale, inventory, payment, and customer-management tools, all of which require reliable networking hardware and internet access. *See* U.S. Chamber of Commerce, *Cloud-Based POS Systems Explained: Key Benefits and Examples* (Apr. 17, 2025), https://www.uschamber.com/co/run/technology/cloud-based-pos-

14

Appellate Case: 26-1787    Page: 20    Date Filed: 07/29/2026 Entry ID: 5666337

systems-explained (explaining that cloud POS systems allow small businesses to process payments and access real-time information through internet-connected devices); Cisco, *Small Business Networking Resources*, https://www.cisco.com/site/us/en/solutions/small-business/resource-center/networking/index.html (last visited July 22, 2026) (describing switches, routers, and wireless access points as core networking components for business networks).

### D. Cisco's conduct is emblematic of right-to-repair restrictions that have harmed competition and consumers for decades.

Cisco's alleged restrictions on midstream resale fit a well-recognized pattern in which manufacturers use control over parts, software, service, or support to impede independent repair and resale channels that would otherwise lower prices and expand choice. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 458 (1992) (describing allegations that Kodak limited independent service organizations' access to replacement parts and made it more difficult for them to compete in servicing Kodak equipment); Fed. Trade Comm'n, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* 17-24 (2021) [hereinafter *Nixing the Fix*] (identifying repair restrictions including limits on parts, manuals, diagnostic tools, software locks, and other practices that impair independent repair).

15

Recent public enforcement confirms the same point in the agricultural-equipment context: the Federal Trade Commission and five states alleged that Deere & Company unlawfully restricted farmers and independent repair providers from making repairs on their agricultural equipment by withholding the software tools needed for electronic repairs. The resulting settlement requires Deere to provide farmers and independent repair providers with many of the same repair resources it provides to authorized dealers for ten years. *See* Press Release, Fed. Trade Comm'n, *FTC, States Secure Settlement with Deere & Company, Advancing Farmers' Right to Repair* (July 8, 2026), https://www.ftc.gov/news-events/news/press-releases/2026/07/ftc-states-secure-settlement-deere-company-advancing-farmers-right-repair; *Nixing the Fix* at 18-24 (discussing restrictions on parts, manuals, diagnostic software, software locks, and related repair barriers).

The healthcare sector, which is rife with these types of anticompetitive restraints, offers a strong cautionary tale as to the consequences of underenforcement. In *Innovative Health*, an independent medical-device reprocessor challenged Biosense Webster's withholding of clinical support from hospitals that used lower-cost reprocessed catheters. *Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-cv-55413, 2024 WL 62948, at *1-3 (9th Cir. Jan. 5, 2024) (reversing dismissal of antitrust claims brought by a reprocessor of cardiac catheters); *see also* Ross Law, *Innovative Health Awarded $147m in Antitrust*

16

Appellate Case: 26-1787     Page: 22     Date Filed: 07/29/2026 Entry ID: 5666337

*Lawsuit Against J&J's Biosense Webster*, MEDICAL DEVICE NETWORK (May 19, 2025), https://www.medicaldevice-network.com/news/innovative-health-awarded-147m-in-antitrust-lawsuit-against-jjs-biosense-webster/ (reporting jury finding that Biosense Webster violated antitrust law by withholding clinical support from hospitals using reprocessed catheters).

In a world where midstream market participants, ranging from independent resellers to independent repairs shops, have little to no recourse against manufacturers' anticompetitive conduct, the consequences will ultimately be borne by consumers in the form of higher prices, reduced quality, and fewer choices.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that independent resale and repair firms play a critical role in protecting competition and consumers, and that antitrust standing should not be restricted in a manner that forecloses claims by market participants such as Appellant. The Court should therefore reverse the district court's dismissal and permit Summit's claims to proceed.

Appellate Case: 26-1787     Page: 23     Date Filed: 07/29/2026 Entry ID: 5666337

Dated: July 23, 2026

Respectfully submitted,

*/s/ Amanda G. Lewis*
Amanda G. Lewis
Christian Hudson
**CUNEO GILBERT**
**FLANNERY & LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Tel: (202) 789-3960
alewis@cuneolaw.com
christian@cuneolaw.com

Zachary Freed
Vienna E. Chan
**CUNEO GILBERT**
**FLANNERY & LADUCA, LLP**
2445 M Street NW, Suite 740
Washington, D.C. 20037
Tel: (202) 789-3960
zfreed@cuneolaw.com
vchan@cuneolaw.com

*Counsel for Amicus Curiae*

Appellate Case: 26-1787    Page: 24    Date Filed: 07/29/2026 Entry ID: 5666337

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 3,530 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: July 23, 2026      Respectfully submitted,

           */s/ Amanda G. Lewis*
           Amanda G. Lewis

Appellate Case: 26-1787  Page: 25  Date Filed: 07/29/2026 Entry ID: 5666337

# CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify that the foregoing brief has been scanned for viruses and is virus-free.

/s/ *Amanda G. Lewis*
Amanda G. Lewis

20

Appellate Case: 26-1787   Page: 26   Date Filed: 07/29/2026 Entry ID: 5666337